IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| JULIE MARIE WESSON KIRK, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>PLANTATION MANOR, INC., and )<br>PLANTATION MANOR ASSISTED )<br>LIVING, LLC, )<br>)<br>Defendants. ) | CIVIL ACTION NO. 99-RRA-2903-W |

**ENTERED**

APR - 2 2002

## MEMORANDUM OF OPINION

This is a race discrimination case. On December 1, 1997, the plaintiff, a white person, began working for Plantation Manor, Inc., a facility generally referred to as a nursing home.[1] On June 26, 1998, approximately seven months later, the plaintiff's employment was terminated. The plaintiff contends that she was fired because she had admitted two black patients, the first black patients since the home came into existence in 1944. The complaint contains four counts. Two counts assert race discrimination under Title VII and 42 U.S.C. §1981, and two counts claim retaliation under Title VII and §1981. The defendant filed a motion for summary judgment, with an accompanying

---

[1] The plaintiff acknowledges that she was employed by Plantation Manor, Inc., and that defendant Plantation Manor Assisted Living, LLC is due to be dismissed.



memorandum of law. The plaintiff filed written opposition, to which the defendant filed a reply.

## FACTS

The court has carefully considered the summary judgment evidence relied upon by the parties as referenced in their legal memoranda. The evidence, of course, is considered in the light most favorable to the plaintiff. Of that evidence, the court sets out the following facts.

Carmelita Lee founded Plantation Manor in 1944. She owned the home until she sold it to Gary Ball in November of 1999. The plaintiff was a licenced practical nurse, whose duties at Plantation Manor included those of a "social worker designee." In that capacity, one of her jobs was to make the initial assessments of persons seeking placement in the home. The name of the first black person the plaintiff admitted to the home is unknown and will be referred to as Jane Doe. Jane was admitted in January of 1998. The day following her admission, Jane left the home. In March, the plaintiff admitted the second black resident, Earline Gillespie, a "DHR" (Department of Human Resources) patient.[2] Gillespie became a permanent resident at Plantation Manor.

---

[2] DHR patients usually came from abusive or neglectful environments.

Eyebrows were raised by non-management employees, such as nursing assistants and part-time activities workers, when Jane Doe was admitted, and Janice Moore, a part-time assistant activities director, testified that she knew the residents would say, "Wait until Ms. Lee finds out." Eyebrows were raised again when Gillespie was admitted. Moore and a black woman who held a position similar to Moore's, told the plaintiff their *belief* that Lee did not want black people there. When the plaintiff asked Debbie Wallace, assistant director of nursing during the time in question, why Jane Doe had left the home, Wallace stated that she thought Jane needed to go to the hospital. The plaintiff then asked what was going on, and Wallace nebulously answered that, right or wrong, Lee's wishes had to be honored. The plaintiff testified that she, the plaintiff, "said something to the effect of that's just wrong," and that Wallace gave her "the *impression* that that was just the way *it* was, there wasn't anything we could do about it." *Plaintiff's Deposition*, p. 104. Wallace, however, stated that Jane had been sent to Plantation Manor by mistake, while Vicky Murphy, the director of nursing, testified that Plantation wanted to keep Jane but could not because the facility did not have a contract with Jane's insurance carrier, Medicare Complete.

When the plaintiff was asked in her deposition whether she had discussions with anyone other than Wallace, activities personnel, or nursing assistants concerning the admission of black patients, the plaintiff pointed to a discussion with Malinda Hoffman, the administrator, which had to do with *DHR* patients:

> Q. Did you have any discussions with anybody else at Plantation Manor about the issue of admitting black residents?
> A. I had a discussion with Malinda Hoffman at one point. She told me not to admit anymore DHR patients.
> Q. This patient was a DHR patient, was she place by DHR? How does that work if you know?
> A. I don't remember if DHR had called me or if she was just - - not destitute. What is the word I'm looking for, indigent, and DHR had picked up her case. I don't remember which of those things it was, but DHR just meant that they didn't have any money or a family that had any money to take care of them.

*Kirk Deposition*, p. 105. The evidence further shows that Lee had walked up to Gillespie, who was a DHR patient, and asked Gillespie who she, Gillespie, was. Lee then spoke with Malinda Hoffman and Vicki Murphy. Apparently as a result of the conversation with Lee, Hoffman told the plaintiff not to admit any more *DHR* patients. Shortly thereafter, Gillespie was relocated to another room. That room was situated at the end of the hall and was further from the "centralized hub" of the facility. The plaintiff asked Gillespie why she had been relocated, and Gillespie replied, "because Ms. Lee did not want to look at her." *Plaintiff's Deposition*, p. 92-92. The plaintiff testified that Gillespie was put "out of sight" because Lee "did not make any secret about how she felt about black people. There were people in the activities department who had *told* [the plaintiff] that she did not want black people in the facility." *Id.* at 94. Moore testified that she had been *told* that "it was an *unspoken rule* not to admit black patients. And everyone knew that. That was just *common knowledge.*" *Moore Deposition*, p. 15. Moore, however, also testified that Lee did not want patients to be seen if they "didn't look good or if you

didn't sit straight and all that," *Moore Deposition*, p. 24, while Murphy gave direct testimony to the reason for assigning Gillespie a different room: Gillespie's elderly husband asked for the room change because he wanted to shorten the distance he would have to walk to get to his wife's room.

The plaintiff states that she applied for a marketing position with Plantation Manor. The home, however, was operating at full or almost full capacity. The plaintiff, therefore, performed other functions, including tasks performed by a social worker. Because the plaintiff was not a licensed social worker, she performed as a "social worker designee." Plantation Manor was required to submit reports to various governmental entities concerning patient care, treatment, and progress. As a social worker designee, the plaintiff could prepare these reports, but they had to be reviewed, approved, and signed by a licensed social worker. Each month the defendant hired an outside professional to come in and sign-off on the various reports.

Gary Ball became administrator of Plantation Home on June 8, 1998. His employment contract included an option to purchase. Ball had extensive experience in the long-term care industry, having served as administrator of three different long-term care facilities. Ball testified that, before assuming his duties as administrator at Plantation Manor, he had determined that the facility was losing money as a result of overstaffing. Shortly after becoming administrator, Ball terminated the employment of fifteen to twenty employees, the plaintiff among them. Ball told the plaintiff that her termination

was due to financial reasons, not because of job performance, and that she would be replaced by a licensed social worker. The plaintiff believes otherwise.

In her deposition, the plaintiff recalled the meeting when Ball dismissed her: "Mr. Ball called me into his office and told me that Ms. Lee had discussed me with him before he had ever come to work there and that she had taken a dislike to me and that that was too bad and they needed a social worker and not a marketing person." *Plaintiff's Deposition*, p. 119. The plaintiff further testified that it was her belief that it was Lee, not Ball, who made the decision to fire her. When the plaintiff was asked to explain, she stated, "[b]ecause [Ball] said Ms. Lee had talked to him before he ever came over there about me and that she had expressed a dislike for me and that sounded to me as if she had told him she would like for me to be fired." *Id.* at 120-21. Ball, however, testified that he did not consult with Lee concerning the plaintiff's dismissal, or even know of any controversy concerning the admissions of Jane Doe or Gillespie at the time he made his decision to terminate the plaintiff. The evidence additionally shows that the plaintiff was replaced by Monica Jett, a licensed social worker, hired at a salary of $26,000 per year, four thousand less than the plaintiff's $30,000 salary. Jett also saved Plantation an additional $7200 per year in outside consultant fees. On November 8, 1999, Ball exercised his option to purchase Plantation Manor.

The plaintiff contends that Lee dislikes black persons and discriminated against them. The plaintiff references portions of Lee's testimony. When asked what she thought

-6-

about black people, Lee stated that she had had a black maid in town for 15 years, and a black maid for 18 years in the country, and that she loved them dearly. The plaintiff points out that Lee could not remember the last names of her maids, and that there is testimony that Lee used the "N" word in private conversations. The plaintiff also asserts that Plantation Manor was cited by the State Board of Health for not having a black resident, and references Lee's testimony in support of that assertion. However, when asked if she had been given a written citation, Lee replied that she had not. An inspector from the Board of Health simply had asked her why she did not have any black residents.[3] Because of that question, though, Lee thought she needed a black resident and unsuccessfully tried to find one. Lee testified that it was difficult to get black residents because Plantation Home was out in the country. (There is evidence that Lee had a black employee dress up like and pretend to be a resident.) Lee said that Jane Doe and Gillespie were the only two black persons who had ever applied for admission. The plaintiff also points to race discrimination claims filed against the defendant, and states that while she was employed with Plantation Manor, management was lacking in color, as its dietary manager, housekeeping/laundry manager, maintenance supervisor, director of nurses, administrator, RN supervisor, and owner were all white.

---

[3] It seems unlikely that the State Board of Health would be officially concerned with the race of nursing home residents.

DISCUSSION

In *Little v. United Technologies*, 103 F.3d 956 (11th Cir. 1997), the Eleventh Circuit set out the law applicable to the facts before this court. A white employee told Little, "Nobody runs this team but a bunch of niggers and I'm going to get rid of them." Little informed several co-workers of this remark, but he did not bring it to the attention of a supervisor or manager until approximately eight months later at a team meeting. Although the employer took immediate action to assure that remarks of that nature were not uttered again, Little contended that he was continually harassed thereafter as a result of having taken a stand against racist comments. The court stated retaliation law:

> Under Title VII, it is an unlawful employment practice for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). As with a discriminatory treatment claim, a plaintiff alleging a retaliation claim under Title VII must begin by establishing a prima facie case; the plaintiff must show that (1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities. *Coutu v. Martin County Bd. of County Com'rs*, 47 F.3d 1068, 1074 (11th Cir.1995) (per curiam).

*Little*, 103 F.3d at 959. The court held, as a matter of law, that Little's protest of a co-worker's one racist comment could not constitute opposition to an unlawful employment practice, because a supervisor or manager must be informed of the discriminatory conduct. In other words, a plaintiff's opposition must be directed at an unlawful practice of an employer, not at an act of discrimination by a fellow employee. "A plaintiff must

show that the employer knew or should have known of the [discriminatory conduct] in question and failed to take prompt remedial action." *Id.* at 959. The court also held that in order to oppose an unlawful employment practice, there must be an unlawful employment practice: "We conclude that a racially derogatory remark by a co-worker, without more, does not constitute an unlawful employment practice under the opposition clause of Title VII, 42 U.S.C. §2000e-3(a), and opposition to such a remark, consequently, is not statutorily protected conduct." *Id.* at 961.[4] However, the court went on to state that even if a racially charged statement cannot, either in law or fact, constitute an unlawful employment practice,

> a plaintiff can establish a prima facie case of retaliation under the opposition clause of Title VII if he shows that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices. *See Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989). It is critical to emphasize that a plaintiff's burden under this standard has both a subjective and an objective component. A plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

*Id.* at 960. Applying this law, the court held that "no rational jury could find Little's belief that his opposition to the racist remark constituted opposition to an unlawful employment practice to be objectively reasonable." *Id.* at 960. After stating that Little did

---

[4] The Court noted that there was only one racially derogatory statement.

not oppose an unlawful discriminatory practice, the Court did not address the plaintiff's harassment contention.

The court then addressed the fact that the district court had not conducted a separate analysis of Little's Title VII and §1981 claims:

> Title VII is not identical to the kind of discrimination proscribed by § 1981. It is well-established that § 1981 is concerned with racial discrimination in the making and enforcement of contracts. *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 436, 88 S.Ct. 2186, 2201, 20 L.Ed.2d 1189 (1968) ("In light of the concerns that led Congress to adopt it and the contents of the debates that preceded its passage, it is clear that the Act was designed to do just what its terms suggest: to prohibit all racial discrimination, whether or not under color of law....").
> Here, there is no evidence in the record--and Little does not suggest or allege--that the discrimination or retaliation allegedly leveled against him was due to his race; that is, Little does not contend that Carrier discriminated against him because he was white. Both the facts and legal framework of Little's action are grounded solely in the opposition clause of Title VII and are unrelated to the concerns explicitly set forth in the language of § 1981. Although we decide this issue based on reasoning not expressed by the district court, *see Church of Scientology v. Cazares*, 638 F.2d 1272, 1281 (5th Cir. Mar. 1981), we are convinced that the court properly determined that Little failed to establish a prima facie case with respect to his § 1981 claim.

*Id*. at 961. The court concluded that Little "failed to allege that the discrimination at issue was related to his race." *Id*.

Certainly, plaintiff Kirk was not discriminated against because of her race, and the court concludes that the defendant is entitled to summary judgment on the plaintiff's retaliation claims for the following reasons. Neither Lee nor anyone in supervisory or management positions ever told the plaintiff not to admit black residents. No one scolded the plaintiff because she admitted Jane Doe and Gillespie. There is no direct evidence that

black persons had ever been denied admission to Plantation Manor, even though Jane Doe and Gillespie were the first black persons to seek admission. Gillespie became a permanent resident, and Jane Doe did not remain at Plantation Manor because of insurance, not race.[5] The mere fact that Plantation Manor went many years without a black applicant does not establish that Plantation Manor would not admit black residents. The plaintiff is forced to rely on the body language and common knowledge of non-management employees, unspoken rules, vague references, hearsay, and the plaintiff's impressions and feelings to prove that Lee had a policy not to admit black residents.[6] Moreover, the plaintiff never complained to Lee that persons were being denied admission to Plantation Manor because of race, and her conversation with Wallace cannot be considered "making a complaint." The evidence is simply insufficient to support a finding that there was a policy or employment practice against admitting black residents. There being no such policy or practice, it follows that the plaintiff did not engage in statutorily protected conduct.

Even if it could be found that the plaintiff engaged in protected conduct, Plantation Manor has given a legitimate, non-discriminatory reason for discharging the plaintiff, and

---

[5] As previously noted, Lee tried to get a black resident after her conversation with Public Health.

[6] In her argument, the plaintiff recognizes that she must rely on inferences to prove her claims. In the court's opinion, the several leaps from the evidence to what the plaintiff must prove are just too great.

the plaintiff has not come forward with evidence creating a factual issue as to pretext. While Ball stated that Lee did not like the plaintiff, he did not state why Lee did not like her. He did state that at the time he made his decision to let the plaintiff go, he had no knowledge of the facts upon which the plaintiff's retaliation claims are based. Ball's stated reason for dismissing the plaintiff, as well as many other employees, was to save money. In the court's opinion, this statement that Plantation Manor would save money by hiring someone who would work for less money than the plaintiff and at the same time be able to sign off on the various reports required by government agencies, thus saving the costs of bringing in an outside professional, does not, as the plaintiff suggests, raise an issue of factual issue of pretext.

## CONCLUSION

Based on all of the evidence referenced by the parties, Plantation Manor, Inc.'s motion for summary judgment is due to be granted and all claims against it dismissed. Plantation Manor Living, LLC is due to be dismissed because it was not the plaintiff's employer. An order in accordance with this memorandum of opinion will be entered.

DONE this 2nd day of April, 2002.

*Robert R. Armstrong*
Robert R. Armstrong, Jr.
United States Magistrate Judge